# **Exhibit 1**



## IN THE CIRCUIT COURT OF BLEDSOE COUNTY, TENNESSEE

| | |
|---|---|
| **CHRISTOPHER A. HUGHES,** ) | |
| ) | |
| **Plaintiff,** ) | **Docket No. 5859** |
| ) | |
| **v.** ) | |
| ) | |
| **REMINGTON ARMS COMPANY, LLC,** ) | **Jury Demand** |
| ) | |
| **Defendant.** ) | |

```
FILED
5-19-2021
CIRCUIT COURT CLERK
BLEDSOE COUNTY
```

## COMPLAINT

Plaintiff, Christopher A. Hughes, by and through undersigned counsel, sues Defendant Remington Arms Company, LLC. ("Remington") and for his Complaint alleges, upon information and belief and based on the investigation to date of his counsel, as follows:

### INTRODUCTION AND SUMMARY OF ACTION

1.      This is an action asserting strict products liability, negligence, violation of the Magnuson-Moss Act, breach of express warranty, breach of implied warranty of merchantability, fraudulent concealment, and violation of the Tennessee Consumer Protection Act.

2.      The patented Walker Fire Control was introduced in 1948 and is found in excess of 5,000,000 Remington brand firearms.

3.      Defendant designed, manufactured marketed, advertised, warranted and sold the Remington Model 700 bolt action rifle with the patented Walker Fire Control (the "Model 700 Rifle" or the "Product"), to Plaintiff as well as the general public. In conjunction with each sale, Defendant advertised that the Product was fit for the ordinary purpose for which such goods were used and was free from defects in materials and workmanship.

4.     As discussed below, Defendant's knowledge of devastating design flaws associated with the Walker Fire Control trigger assembly dates back to before the assembly was ever placed into the stream of commerce. Defendant's knowledge of the defects associated with the fire control continued to grow. Indeed, Defendant has known since 1979 that at least one percent of all Model 700 Rifles at that time would "trick," allowing them to fire unexpectedly without a trigger pull.

5.     On information and belief, Plaintiff contends that this percentage is vastly understated and that all Model 700 Rifles are subject to unexpected firing without a trigger pull because of the design defects inherent in the Walker Fire Control trigger assembly which are common to all Models that employ this fire control and the "trick condition" which results in a fire on safe release ("FSR") malfunction is only but one common form of malfunction associated to this design.

6.     Despite decades of knowledge related to the various dangerous conditions of the Model 700 Rifle, Defendant never issued an adequate warning and Remington continues to falsely represent to the public that the Model 700 is a trusted, safe and reliable Rifle.

## JURISDICTION AND VENUE

7.     Defendant conducts substantial business in Tennessee, including the sale and distribution of the Remington firearms, and has sufficient contacts with Tennessee or otherwise intentionally avail itself of the laws and markets of Tennessee, so as to sustain this Court's jurisdiction over Defendant.

8.     Defendant is registered to do business in Tennessee with a registered agent: CT Corporation System, 300 Montvue Road, Knoxville, TN, 37919.

9.    ...This Court has jurisdiction over the subject matter of this action pursuant T.C.A. §16-10-101, et. Seq.

10.   Venue is proper in this district pursuant to T.C.A. §20-4-104, et seq. because Bledsoe County is where a substantial part of the events giving rise to the cause of action accrued. Specifically, the rifle malfunctioned and severely injured plaintiff in Bledsoe County. Additionally, venue is appropriate for the claims arising out of Tennessee's Consumer Protection Act because the statute applies to any company engaging in any of the activities regulated by the Act within the State of Tennessee.

## PARTIES

11.   Defendant Remington, was, and is now engaged in the business of designing, manufacturing, assembling, distributing and selling firearms, and in this regard did design, manufacture, distribute, sell and, place into the stream of commerce, the Remington Model 700, Bolt Action Rifles including the action, fire control system, and safety, knowing and expecting that said rifle would be used by consumers and around members of the general public.

12.   Remington continues in the design, manufacture, distribution and sale of all Remington Arms product lines including the Remington Model 700 bolt action rifle, without any significant changes.

13.   Plaintiff, Christopher Hughes, is and, at all relevant times hereto was, a citizen and resident of Hamilton County, Tennessee. Specifically, Plaintiff resides at 808 Ellen Road, Hixson, Tennessee.

14. .   On March 4, 2014, Plaintiff's maternal step-grandfather, Conrad Harris, purchased a Remington 700, ADL 270, serial number RR90443C from Sportsman's Warehouse

in Chattanooga, Tennessee.  Conrad Harris purchased this rifle as a birthday gift for his

grandson, Plaintiff, Christopher Hughes.

15.    A true and correct copy of the receipt is listed below:

```
04-16-21                                Chattanoog
 2:48 PM                    TRANSACTION DETAIL REPORT
                               FOR Mar 04 2014

Site #: 152  Sportsman's Wbse Chattanooga

CUSTOMER ID:0152-675353
          HARRIS
  1031884 TBI/TICS FEE        10.00
  307025 FED CLSSC CNTRF      21.99  T
  1238842 ALLEN NEO CASCA     17.99  T
  1249978 REM 700 ADL 270    429.99  T
          SERIAL:RR90443C

          SUBTOTAL           479.97
          SALES TAX           43.47
          TOTAL              523.44
          MC                (523.44)

MC            SALE  $523.44
XXXXXXXXXXXX7320  SWIPED
APPR: 004574
JOURNAL:: 0152079394989900

Tran Code: 068 109N 007 01DA

                        378      # 37
Register:REG7   Mar  4 2014 11:10 AM
```

-------------------

 16.    Plaintiff was the only person who used this rifle.  Plaintiff only used this rifle on

occasion or from time to time.  Plaintiff never had any modifications to this rifle.  Plaintiff kept

this rifle in a gun safe.  Plaintiff properly cleaned the rifle before and after use.  Plaintiff never

disassembled, reassembled, modified or rebuilt the rifle.

17.    In July of 2018, Plaintiff joined the United States Marine Corp. From July of

2018 until January of 2020, Plaintiff acquired extensive experience with rifles and became very

proficient with use of rifles and firearms and the proper maintenance thereof.

18.    Plaintiff has an 8 year contract with the United States Marine Corp. Plaintiff

earned approximately $20,000 a year plus extensive benefits.

19.    On January 18, 2020, was on his grandfather (Russell Clark) farm located at 185

Suzanne Road in Bledsoe County, Graysville, Tennessee. Plaintiff was with his girl friend,

Andrea O'rear, and best friend, Nate Newt. Plaintiff and his two friends were driving a truck on

the rural farm when they saw a coyote in a field. Plaintiff exited the truck and retrieved the

Remington 700 rifle. A true and accurate picture of the serial number, make and model is listed

below.



20.    As Plaintiff was moving the safety from the safe position to the fire position, the

rifle suddenly and unexpectedly fired without a pull of the trigger.

21.    The unexpected firing of the rifle resulted in the bullet ripping Plaintiff's calf, bone and muscle from his left leg.

22.    The picture below accurately displays the disabling and disfiguring injury to plaintiff's left leg.



## COMMON FACTUAL ALLEGATIONS
## WALKER FIRE CONTROL TRIGGER ASSEMBLY DEFECT

23. The Walker Fire Control Trigger Assembly is unique to the world of firearms and is exclusive to Remington brand products. The design utilizes an internal component known as a trigger "connector." This design feature uses this additional part which in practice and in effect creates a unique trigger design comprised of two distinctly different parts. The Trigger Connector design has not been adopted by any other rifle manufacturer. The connector floats on top of the trigger and is not physically attached to the trigger in any fashion but rather is held in place by tension from a spring and the side plates which create a fully enclosed housing. (See Illustration 1).



Illustration 1

24.     Upon pulling the trigger the connector is pushed forward by the upper member of the trigger body, which allows the sear to fall and rifle to fire. (See Illustration 2).



Illustration 2

25.     The connector sits under the sear with a specified overlap of as little as 20/1000ths of an inch, which is approximately equal to one-half of the width of a dime or eight human hairs.

26.    When a rifle is fired the connector repeatedly separates from the trigger body,
creating a gap between the two parts. Because of the gap created between the trigger body and
trigger connector upon firing, field debris, manufacturing scrap, burrs from the manufacturing
process, lubrication applied at the factory, other lubrication build up, or moisture can foreseeably
become trapped inside the enclosed fire control housing and restrict the return of the trigger
connector to proper engagement under the sear, thus predisposing the rifle to malfunction in the
absence of a trigger pull.

27.    The above described conditions have been further enhanced by various
interferences created between other parts that are used to comprise this fire control during their
assembly.

28.    These conditions have been created as the result of tolerances that Remington has
adopted for "ease of manufacture" including loose inspection practices of parts prior to their
assembly as a cost saving measure on the part of the company. (Illustration 3). Binding created
by interference with other parts of the fire control can also interfere with the return of the trigger
connector to proper engagement under the sear which will create the same dangerous condition.



29.     When the gap between the connector and trigger is large enough, thereby diminishing the engagement (overlap) of the two parts, the connector will no longer reliably support the sear, allowing the rifle to fire without a trigger pull. These unintended firings have been so persistent and common place that Remington has adopted acronyms for the various most common forms of malfunction that Remington itself has observed to occur, i.e., Fire on Bolt Closure "FBC"; Fire on Bolt Opening "FBO"; Fire on Safe Release "FSR"; Jar Off "JO", Fire Off Safe "FOS" and "Fails to Fire."

30.     Remington engineers have testified in product liability litigation throughout the country that materials can lodge between the connector and trigger, resulting in the connector being unable to return to a reliable position to support the sear. Indeed, Remington undertook several redesign efforts in the 1940s, 1970's, 1980s and 1990s to try to eliminate the functional deficiencies associated with materials becoming lodged between the connector and trigger, or binding of the connector with other parts of the fire control.

31.     There is no sound engineering reason to employ a separate connector that is not physically connected to the trigger. This is evidenced by the fact that at no time has any other firearm manufacturer in the world utilized such a device. Many after-market manufacturers have also created replacement triggers that could be used to replace the defective Walker Fire Control system that did not include trigger connectors. Indeed, Mr. Walker himself confirmed in January 2011 that the extra connector served no engineering purpose other than to make operation of the trigger pull smoother for the user, and to reduce the manufacturing cost of the fire control.

32.     Finally acting upon information that it has had for years, in 2006 Remington created and began utilizing a new fire control system called the X-Mark Pro. This design eliminated the use of a two piece trigger design and a separate trigger connector that is not

affixed to the trigger body. Yet despite all of the information Remington has related to the . . .
thousands of complaints associated with the Walker Fire Control trigger assembly, it has not
undertaken a recall to replace the Walker Fire Control system with the X-Mark Pro or another
safe design. And making matters even worse, Remington has continued to utilize the Walker Fire
Control trigger assembly in some rifles after the design of the X-Mark Pro was released to the
public in 2006, in spite of an agreement reached with the family of Gus Barber iin 2002 to
discontinue production of the Walker fire control after the release of the X Mark Pro.

## DEFENDANT'S KNOWLEDGE OF THE DEFECT

33.     Defendant designed the Walker Fire Control trigger assembly and began
manufacturing and distributing firearms containing that trigger assembly in March of 1948.
Internal Remington documents show that almost immediately following the production of these
early Walker Fire Control system firearms, Remington became aware that the firearms were
firing without a trigger pull as a result of communications to Remington by consumers.

34.     Defendant produced several models of firearms containing the Walker Fire
Control. The vast majority of these firearms are part of the Model 700 bolt action rifle series,
with over five million of these rifles having been placed into the stream of commerce since 1962.

35.     Defendant has made hundreds of millions of dollars over the last six decades
through the sale of their Model 700 bolt action rifles.

36.     Defendant designed, manufactured, distributed, sold and, placed the Rifles into
the stream of commerce knowing and expecting that they would be used by consumers and
around members of the general public.

37.     Just six years after introducing the Model 700 bolt action Rifles to the consuming

public, in March 1968 Consumer Reports wrote an article describing inadvertent discharges in

the Model 700 Rifle:

> The sixth-ranked rifle, the Remington 700, exhibited a potentially
> dangerous flaw as first tested. There was so little clearance between the
> trigger and the trigger guard that when the trigger was pulled with the safety
> on (something you or a friend might do when sighting down the rifle or
> trying it for feel), the trigger sometimes failed to return to its forward
> position. And with the trigger in the back position, the rifle would fire
> without warning the next time the safety was moved to the fire position. The
> malfunction persisted for more than 100 firings before the trigger wore in
> and performed normally. An unwary buyer might have caused a serious
> accident by then.

38.     According to an internal Remington memorandum, upper management at

Remington expressed "extreme displeasure" to the Consumer Reports article.

39.     The warnings outlined by Consumer Reports proved true and over the past fifty

years, Defendant received thousands of complaints in the form of letters, telephone calls and

emails that Remington Model 700 rifles containing the Walker Fire Control fired without a

trigger pull.

40.     In 1978, Remington's insurance company settled a personal injury case brought

by John Coates for $6.8 million when he was paralyzed by an unintended firing of a Model 600

rifle. Shortly after the settlement, Remington made the decision to recall all of its Model 600

series rifles. The Model 600 series rifle utilized the Walker Fire Control which similarly

employed an independent trigger connector. The Model 600 rifle was not nearly as popular as the

Model 700 rifles, with far fewer firearms in commerce.

41.     At the same time Defendant recalled the Model 600 rifles, and recognizing that

similar unintended firings in the absence of a trigger pull were occurring across the country with

its more popular Model 700 bolt action rifles, Remington contemplated conducting a similar recall of the Model 700 rifles.

42.     Internal documents show that Remington, using self-serving conjecture and assumptions, opted not to recall the Model 700 Rifles because, of the 2,000,000 firearms that were in commerce at the time, Remington concluded that "the recall would have to gather 2,000,000 rifles 'just' to find 20,000 effected rifles" in the hands of the public at that time. To put this into perspective, this number would indicate that about 1 out of every 100 rifles in the hands of the public were effected with a condition that would potentially result in the rifle firing on safety release, according to Remington's own estimate at that time when they were considering this recall. This decision was made in light of full knowledge that: "A common source of accidents with firearms is accidental discharge." In the same company document Remington also acknowledges that: "A safety is provided to prevent accidental discharge."

43.     Rather than take the responsible action and recall the Model 700 rifles at the same time it recalled the Model 600 rifles, Remington focused its efforts on distancing the recalled models from other models it continued to produce containing the Walker fire control. Remington also focused on creating a safe gun handling defense to product liability claims that Remington expected due to incidents of unintended firings that resulted in personal injury or death. Remington modified the "10 Commandments of Gun Safety" to shift responsibility for personal injuries or death to the gun handler. This was the beginning of a trend that Remington has followed for over forty years – blame the consumer and hide any knowledge of the Walker Fire Control trigger assembly design defect.

44.   . .Throughout the 1970s Remington continued to consider safer alternative designs

and enhancements to the Walker Fire Control system. An internal memo dated November 16,

1978 states:

> The following design requirements for a new fire control for bolt action
> rifles were tentatively established – Eliminate the "trick" condition. At this
> point the best solution appears to be adding a trigger block to the safety cam
> mechanism. This would prevent the trigger from moving in the "safe"
> position – eliminating the "fail to reset" possibility.

The document goes on to recommend that the new fire control should be "retrofittable" to the

Model 700. A 1980 - 1981 Firearms Research Division programs schedule lists as a "necessity"

"fire control improvement" because it was "necessary to reduce product liability". These new

designs all centered on the concept of removing the floating connector and incorporating a

trigger block to force full engagement of the trigger and sear. Remarkably, when it appeared that

Remington was going to pull the proverbial trigger and change the defective design by including

a safety that blocked both the trigger and the sear, Remington decided to put its financial

interests over the health and safety of the consuming public. On December 30, 1985, an internal

document states "R & D is working on improved safety and security features which should have

marketable value. (If they don't, we ought to stop the work.)." Unfortunately, work on the new

design stopped shortly after the issuance of this memorandum. Instead, internal hand written

notes from an October 19, 1993 document titled ("Liability Point of View") demonstrate that

Remington is not concerned about safety, but rather having a "readily defensible reason for

departure from current design."

45.     In 1994, a jury rendered a $17 million verdict against Remington related to the

Model 700 design defect. After the verdict internal Remington documents pose a simple

question: "IS THE RIFLE SAFE?" Accountants ultimately did the math and determined that if

only 30% of its customers actually returned the rifles as part of a nationwide recall of the Model 700 bolt action rifles, it would cost Remington $22 million to conduct the recall. Remington opted against a recall.

46.     In 1995, Remington documents revealed that further efforts to redesign the Walker Fire Control trigger assembly were underway. Unfortunately, the redesign project was doomed before it began. Remington's Fire Control Business Contract of January 27, 1995 provided (emphasis added):

-     The goal is to provide a fire control that "feels" the same to our customers yet provides additional safeguards against inadvertent or negligent discharges.

-     The purpose of the redesign of the fire control is to reduce the number of parts required, lower cost and to add design characteristics that enhance the safety attributes of our firearms.

-     Under "Financial Analysis" the truth is further revealed: This is where the rubber meets the road. Is the project worth doing? What are the minimum forecasts to insure profitability and does our pricing structure support these expected profits.

47.     This sentiment was echoed by Robert Haskin, Remington's former general counsel and vice-president of marketing, who testified that "[i]t was my opinion that the new product was only worth doing if we could achieve certain goals, one of which was that it costs the same or less, another was that we could make certain improvements on the product, which you asked me to characterize, and I said my opinion could fairly characterized as safety issues." So while Remington on the one hand took the position that any redesign of the Walker Fire Control trigger assembly was focused on addressing safety issues, the reality is that when the rubber meets the road, safety would take a back seat to profit.

48.     Remington possessed clear knowledge by the late 1990s that the Walker Fire Control trigger assembly was dangerous and defective. Yet a clear decision was made that there

would not be a public warning and the defective Rifles would not be recalled. Instead Remington decided to introduce a new rifle series to the consuming public — the Model 710. When designing the Model 710, Remington looked at what fire control system to employ in the new product. In 1997 the answer was straight forward – "Not the M700 fire control."

49.     An internal February 1998 memo shows that Remington considered the costs to change their manufacturing process to produce a safer trigger assembly. It was determined that to change the trigger assembly it would require "fairly substantial investments in capital and technical resources" to increase their processing capabilities in Ilion, New York. In May 1998, the new trigger design was put on hold by Remington management "until economics and [the] project is approved." Repeating its historical practice of putting profits over safety, on August 25, 1998, Remington abandoned implementation of a new, safer trigger design because of an "estimated cost increase." Instead, to "eliminate development cost and time," Remington used the unsafe Walker Fire Control mechanism in the Model 710, completely reversing its decision made just eighteen months earlier to "Not [use] the M700 fire control." 46. During testing of the Model 710 rifle, internal Remington documents reveal that on more than one occasion during pilot testing the rifles fired upon bolt closure and fired when the safety was moved from the safe to the fire position. Despite these internal testing failures, Remington introduced the Model 710 rifle to the consuming public in 2000. Remington's knowledge of the potential dangers of the Model 710 rifle were so obvious that it issued a call order to its customer service department regarding how to handle customers who call complaining of unintended firings.

50.     Following the preventable death of a 9 year old boy, Gus Barber, Remington did eventually agree to a limited safety modification program. Young Gus died when his mother moved the safety into the off position in order to unload her rifle, which caused the rifle to

discharge suddenly and unexpectedly without a trigger pull. Gus's death garnered nationwide

attention after his family became committed to seeing to it that Remington take necessary steps

to prevent future needless death or injury. After the Barber incident and only after the sustained

media attention to this serious safety issue was brought to the forefront attention of the public,

Remington ultimately agreed to a safety modification program for rifles produced prior to 1982

that contained a "bolt-lock" feature, which requires the safety to be placed in the off position in

order to unload the gun. This modification program (as compared to a recall) addressed one issue

with pre-1982 Rifles, the propensity of the rifle to fire when a consumer was forced to unload the

rifle with the safety off. This modification failed to address the documented defects related to the

Walker Fire Control trigger assembly however. The modification simply now allowed users to

cycle the bolt with the safety on. This modification did not correct the underlying potential of a

rifle firing without a trigger pull.

     51.    From 1992 to 2004, Defendant acknowledge receiving 3,273 customer complaints

about Remington Model 700 rifles firing without a trigger pull. This amounts to an average of

approximately five unintended firings per week for this twelve year period. On information and

belief, the actual number of unintended firings for this time period is much higher because it is

unlikely that every consumer who experienced a misfire would report the problem to Remington

if he was lucky enough to avoid injury or property damage.

     52.    In response to complaints from consumers regarding unintended firings of the

Model 700 Rifle without a trigger pull, consumers were and are asked to return their rifle to

Defendant for repair and testing. Defendant purportedly test the rifle, albeit using undisclosed

testing procedures. Following the testing, Defendant consistently claims that it was "unable to

duplicate" the unintended discharge, or that they were or are "unable to duplicate" the

customer's complaint. On information and belief, Defendant's statements are false and fraudulent and made to deceive and continue to deceive consumers about the defects associated with the Rifles. Tellingly, Defendant admits internally that "a common source of accidents with firearms is accidental discharge" and that "a safety is provided to prevent accidental discharge."

53. On occasion, Remington has concluded a customer's malfunction was the result of the condition of the rifle, due to rust, corrosion, poor maintenance, excess lubrication or some other "abuse" of the rifle. Remington's literature and Owner's Manuals contain no such admonitions or warnings regarding the "abuse" of Model 700 rifles or the consequences that may result in dangerous malfunctions. On the contrary, some Owner's Manuals issued by Remington specifically state, "The firearm will fire when the trigger is pulled." There is no warning or instruction that any such "abuse" or any other condition of the rifle will result in a firing of the rifle in the absence of a trigger pull.

## THE CNBC DOCUMENTARY

54. On October 20, 2010, after a ten month investigation, CNBC aired a documentary entitled, "Remington Under Fire: A CNBC Investigation." The "CNBC Original documentary examines allegations that the Remington Model 700 series hunting rifle is prone to firing without pulling the trigger, and that its manufacturer, Remington, has been aware of this concern for almost 60 years. Dozens of deaths, scores of injuries, and more than five thousand customer complaints have been linked to the alleged problem. The story is told through former corporate insiders and the company's own internal documents."[1] During the documentary, the reporter speaks to several gun owners who suffered devastating consequences as a result of the 700-series

---

[1] See Remington Under Fire: A CNBC Investigation, About the Show, http://www.cnbc.com/id/39554879/ (last visited Dec. 24, 2012).

rifle, including Richard Barber, a father who has devoted his life to finding answers about the tragic death of his nine-year old son which resulted from a fire on safety release "FSR" malfunction with a Remington Model 700 bolt action rifle containing the Walker Fire Control.

55.    As part of the investigation for the documentary, CNBC interviewed Mike Walker, the Remington engineer who designed the Walker Fire Control trigger for the 700 rifle. "Walker's internal company memos, obtained by CNBC, indicate that he repeatedly raised concerns, even after he retired from Remington, about the trigger system he designed." See id.

56.    "Other concerns were raised as well, including one from a Remington colleague who warned in a memo, 'this situation can be very dangerous.' Walker proposed a relatively inexpensive solution, though Remington has never recalled the rifle, and insists it has no defect." See id. In fact, on information and belief, Remington repeatedly considered a "call back" of the 700 rifle, but decided against it.

57.    As part of its investigation for the documentary, CNBC spoke with a former Remington employee whose job involved dealing with customer complaints related to the 700-series rifle. This former employee informed CNBC that he was instructed not to acknowledge any problem with the rifle because, if he had, he would have lost his job.

58.    Remington responded to the numerous first-hand accounts of unintended firings from the Model 700 rifle by maintaining that the unintended firings are the result of poor maintenance and unsafe handling, often by inexperienced users.[2] In fact, Remington gave a written statement to CNBC before the documentary aired. This statement, mentioned during the

---

[2] Remington Point by Point Response, http://www.remington700.tv/fileadmin/pdfs/point-by-point-response.pdf (last visited Dec. 24, 2012).

program, contained the following statements which Remington knew were false when they were

made:

    • The Model 700, including its trigger mechanism, has been free of any defect since it
was first produced and, despite any careless reporting to the contrary, the gun's use by millions
of Americans has proven it to be a safe, trusted and reliable rifle.

    • Both Remington and experts hired by plaintiff's attorneys have conducted testing on
guns returned from the field which were alleged to have fired without a trigger pull, and neither
has ever been able to duplicate such an event on guns which had been properly maintained and
which had not been altered after sale.[3]

    59.    After CNBC aired the documentary, Defendant published several responses,

including a website located at http://remington700.tv, an Official Statement for CNBC Program

Regarding the Model 700, and a Point by Point Response to the CNBC documentary.

    60.    These responses contained false and deceptive statements intended to deceive the

public, including the claim that the Remington Model 700 rifle is a safe and reliable firearm that

can only fire without a trigger pull where the rifle improperly modified or maintained.

Specifically, Remington's responses contained the following statements that Remington knew

were false:

    • Recently CNBC produced an "expose" claiming that the trigger mechanism of the
Model 700 rifle has a deadly design flaw. This claim is demonstrably false.[4]

    • Both Remington and experts hired by plaintiff attorneys have conducted testing on guns
returned from the field, which were alleged to have fired without a trigger pull, and neither has
ever been able to duplicate such an event on guns which had been properly maintained and
which had not been altered after sale.[5]

---

[3] Remington Arms, Official Statement for CNBC Program Regarding the Model 700, submitted September 7, 2010,
http://www.remington700.tv/fileadmin/pdfs/OfficialStatement.pdf. (last visited Dec. 24, 2012).

[4] Remington Point by Point Response, http://www.remington700.tv/fileadmin/pdfs/point-by-point-response.pdf (last
visited Dec. 24, 2012)

[5] Remington Point by Point Response, http://www.remington700.tv/fileadmin/pdfs/point-by-point-response.pdf (last
visited Dec. 24, 2012); see also Remington Arms, Official Statement for CNBC Program Regarding the Model 700,
submitted September 7, 2010, http://www.remington700.tv/fileadmin/pdfs/OfficialStatement.pdf. (last visited Dec.
24, 2012).

• Each of the tragic and emotional personal injury and death cases cited by CNBC involve a breach of one or more important gun safety rules:

• Failure to keep the rifle pointed in a safe direction • Failure to properly maintain the rifle.

• Altering the rifles trigger mechanism • Failure to have the safety engaged when not actively engaged in firing the rifle.[6]

• The Barber rifle had been modified in multiple ways and poorly maintained (rusted action). Even so, in testing by experts for both Remington and the Barber family, the Barber rifle would fire only by pulling the trigger while the safety was in the fire position.[7]

• The truth about accidental discharges is clear. These things don't go off by themselves.[8]

• The Model 700, including its trigger mechanism, has been free of any defect since it was first produced and, despite any careless reporting to the contrary, the gun's use by millions of Americans has proven it to be a safe, trusted and reliable rifle.[9]

• No scientific test has ever supported the accidental discharge theory of plaintiffs' lawyers and their expert. That's true, even with a gun at the center of the CNBC report. The reporter tells the compelling story of the Barber family who lost their son in a hunting accident a decade ago. • But the show never reveals the condition of the gun, which experts found was heavily rusted, with the trigger engagement screw, safety lever, and fire control mechanism all adjusted, or removed and reinstalled.

• The gun fired only when the safety was in the fire position and the trigger was pulled, exactly as it was designed to do.[10]

---

[6] Remington Point by Point Response, http://www.remington700.tv/fileadmin/pdfs/point-by-point-response.pdf (last visited Dec. 24, 2012).

[7] Remington Point by Point Response, http://www.remington700.tv/fileadmin/pdfs/point-by-point-response.pdf (last visited Dec. 24, 2012).

[8] Remington Point by Point Response, http://www.remington700.tv/fileadmin/pdfs/point-by-point-response.pdf (last visited Dec. 24, 2012).

[9] Remington Point by Point Response, http://www.remington700.tv/fileadmin/pdfs/point-by-point-response.pdf (last visited Dec. 24, 2012).

[10] Chen, Joie, "Remington's In-Depth Response to CNBC Under Fire," http://www.remington700.tv/#, Tr. at [00:02:25;16]; [00;13:10;08]; and [00:03:18,27].

61.     In these responses, Defendant continued to fraudulently, deceptively and falsely state that Remington rifles containing the Walker Fire Control system can only fire without a trigger pull when they are improperly modified or improperly maintained.

62.     According to public records, there have been more than 140 lawsuits filed against Defendant involving serious injury or death as a result of a firing in the absence of a trigger pull of Remington bolt action rifles containing the Walker Fire Control.

63.     In May of 2017 Defendant finally issued a recall of its Model 700.

64.     "Remington has determined that some Model 700 and Model Seven rifles with XMP triggers could, under certain circumstances, unintentionally discharge," the company said in the recall notice from May of 2017. "A Remington investigation has determined that some XMP triggers might have excess bonding agent used in the assembly process. While Remington has the utmost confidence in the design of the XMP trigger, it is undertaking this recall in the interest of consumer safety to remove any potential excess bonding agent applied in the assembly process."

65.     The above statement by Defendant continues to falsely understate the dangerous and deadly defect in the firing mechanism.

66.     Defendant had Plaintiff's grandfather's contact information as demonstrated in paragraph #15 from the purchase of the firearm at Sportsman's Warehouse. Yet, Defendant made no attempt to call or write Conrad Harris to warn of this deadly defect.

67.     The above recall notice was insufficient and ineffective in giving Plaintiff actual notice of the deadly product defect.

## ESTOPPEL FROM PLEADING AND TOLLING
## OF APPLICABLE STATUTES OF LIMITATIONS

68.     Defendant is estopped from relying on any statutes of limitation or repose by

virtue of its acts of fraudulent concealment, which include Defendant's intentional concealment

from Plaintiff and the general public that its Product was defective, while continually marketing

the firearm as a durable and suitable product.

69.     Given Defendant's failure to disclose this known but non-public information

about the defective nature of the Product – information over which it had exclusive control – and

because Plaintiff therefore could not reasonably have known that the firearms were defective,

Defendant is estopped from relying on any statutes of limitations or repose that might otherwise

be applicable to the claims asserted herein.

70.     Defendant filed chapter #11 bankruptcy in the Bankruptcy Court for the Northern

District of Alabama on July 27, 2020, under docket # 20-81688-CRJ11. This bankruptcy stayed

the tolling of Plaintiff's statute of limitations from the date of loss of January 8, 2020. Plaintiff

has properly filed suit within 30 days of expiration of the automatic stay as required by 11 USC §

108 (C). See exhibit A to this Complaint for lifting of automatic stay as of 4/28/21 as to this

claim.

## COUNT I
## VIOLATION OF THE TENNESSEE CONSUMER PROTECTION ACT
## T.C.A. § 47-18-101 et seq.

71.     Plaintiff adopts and incorporates by reference all allegations contained in the

foregoing paragraphs as though fully set forth herein.

72.     This cause of action is brought pursuant to the Tennessee Consumer Protection

Act, T.C.A. § 47-18-101 et seq. (hereafter "TCPA").

73. T.C.A. § 47-18-101 et seq. declares unlawful "Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce ..."

74. Plaintiff is a "person" and the transactions at issue in this Complaint constitute "trade or commerce" as defined by T.C.A. § 47-18-101 et seq.

75. Defendant violated T.C.A. § 47-18-101 et seq. by engaging in the unfair and deceptive actions and/or omissions as described herein by engaging in unfair or deceptive acts or practices that occurred in trade or commerce, had an impact on public interest, and caused injury to property.

76. In violation of TCPA, Defendant employed fraud, deception, false promise, misrepresentation and the knowing concealment, suppression, or omission of material facts in their sale and advertisement of the Product in the State of Tennessee.

77. Defendant engaged in the concealment, suppression, or omission in violation of the TCPA when, in selling and advertising the Product, they (1) represented that the Product was free of defects and would not fire without a trigger pull when, at best, it lacked credible evidence to support those claims, and, at worse, knew the Product was, in fact, defective in that it has the propensity to fire without a trigger pull, was not suitable to be used for its intended purpose, and otherwise was not as warranted and represented by Defendant; (2) failed to disclose to, or concealed from, consumers material facts about the defective nature of the Product; and (3) failed to disclose its own knowledge of the defective nature of the Product when Defendant knew that there were defects in the firearms which would result in damage and harm.

78. Defendant engaged in the concealment, suppression, or omission of the aforementioned material facts with the intent that others, such as Plaintiff and/or the general

public would rely upon the concealment, suppression, or omission of such material facts and purchase Defendant's Product with said design defect.

79.     The concealment, suppression, or omission of the aforementioned material facts had the capacity to and did so deceive a substantial portion of the public including the members of the class into believing the Product was free of defects.

80.     Plaintiff would not have purchased or accepted possession or used the Product had he known or become informed of the material defects.

81.     Defendant's concealment, suppression, or omission of material facts as alleged herein constitutes unfair, deceptive and fraudulent business practices within the meaning of the TCPA.

82.     Defendant has acted unfairly and deceptively by misrepresenting the quality, safety and reliability of the Product.

83.     Defendant either knew, or should have known, that the Product was defectively designed and/or manufactured and would fire without a trigger pull, which would result in damage to property and injury.

84.     Upon information and belief, Defendant knew that, at the time the Product left Defendant's control the Product contain the defect described herein resulting in a misfire. At the time of sale, the Product contained design and construction defects. The defects reduced the effectiveness and performance of the Product and rendered it unable to perform the ordinary purposes for which it was used as well as cause the resulting damage described herein.

85.     As a direct and proximate cause of the violation of TCPA, described above, Plaintiff has been injured in that he received the purchased firearm from his grandfather with the defective trigger based on nondisclosure of material facts alleged above. Had Plaintiff known the

defective nature of the trigger, his grandfather would not have purchased and plaintiff would not
have accepted the Product or used the product.

86.     Defendant used unfair methods of competition and unfair or deceptive acts or
practices in conducting its businesses. This unlawful conduct is continuing, with no indication
that Defendant will cease.

87.     Defendant's actions in connection with the manufacturing and distributing of the
Product as set forth herein evidences a lack of good faith, honesty in fact and observance of fair
dealing so as to constitute unconscionable commercial practices, in violation of the TCPA,
T.C.A. § 47-18-101 et seq.

88.     Defendant acted willfully, knowingly, intentionally, unconscionably and with
reckless indifference when it committed these acts of consumer fraud.

89.     Said acts and practices on the part of Defendant was and are illegal and unlawful
pursuant to T.C.A. § 47-18-101 et seq. As a direct and proximate result of Defendant's violations
of T.C.A. § 47-18-101 et seq., Plaintiff has suffered damages. Plaintiff is entitled to actual
damages, including but not limited to the difference in value between the Product as it was
originally delivered and as it should have been delivered, equitable and declaratory relief,
punitive damages, treble damages, costs and reasonable attorney's fees.

## COUNT II STRICT PRODUCTS LIABILITY
### (DESIGN DEFECT, MANUFACTURING DEFECT AND FAILURE TO WARN)

90.     Plaintiff adopts and incorporates by reference all allegations contained in the
foregoing paragraphs as though fully set forth herein.

91.     At all relevant times, Defendant was engaged in the business of manufacturing Remington Model 700 bolt action rifles with the patented Walker Fire Control, which is the subject of this action.

92.     The Product was expected to and did reach Plaintiff without substantial change to the condition in which it was designed, manufactured and sold by Remington.

83.     The Product sold to Plaintiff's grandfather was and is defective and unfit for its intended use. The use of the Product has caused physical injury to Plaintiff.

94.     The Product was so defective in design or formulation or manufacture that when it left the hands of Defendant, the foreseeable risks exceeded the benefits associated with the design, formulation or manufacture of Remington Firearms.

95.     At all times herein mentioned, the Product was in a defective condition and unsafe, and Defendant knew, or had reason to know, or should have known that the Product was defective and unsafe, especially when used in the form and manner as provided by Defendant.

96.     Plaintiff utilized the Product for the purposes and manner normally intended.

97.     Defendant had a duty to create a product that was not unreasonably dangerous for its normal, intended use and would not result in injury to Plaintiff.

98.     Plaintiff, acting as reasonably prudent person, could not have discovered that Defendant's Product was defective as herein mentioned or perceive its danger.

99.     The Product designed, manufactured, warranted, advertised and sold by Defendant was defective due to inadequate warnings or instructions and/or inadequate testing.

100.    By reason of the foregoing, Defendant is strictly liable to Plaintiff for designing, manufacturing, and selling the Product.

101... Pursuant to T.C.A. Section 29-28-105 the Product is unreasonably dangerous at the time it left he control of Defendant.

102. Plaintiff demands judgment against the Defendant for compensatory damages for themselves and each member of the Class, for the establishment of the common fund, plus attorney's fees, interest and costs.

## COUNT III
## NEGLIGENCE

103. Plaintiff adopts and incorporates by reference all allegations contained in the foregoing paragraphs as though fully set forth herein.

104. Defendant had a duty to Plaintiff to exercise reasonable and ordinary care in the formulation, testing, design, manufacture, and marketing of the Product.

105. Defendant breached its duty to Plaintiff by designing, manufacturing, advertising and selling to Plaintiff's grandfather and Plaintiff a product that is defective and has the propensity to fire without a trigger pull, and by failing to promptly remove the Product from the marketplace or to take other appropriate remedial action.

106. Defendant knew or should have known that the Product was defective, had the propensity to fire without a trigger pull, and otherwise was not as warranted and represented by Defendant.

107. As a direct and proximate cause of Defendant's negligence, Plaintiff has suffered actual damages in that he received the product as a gift from his grandfather that is defective and that has the propensity to fire without a trigger pull. This defect has rendered the Product valueless and has caused Plaintiff to suffer serious injury and to incur expenses repairing or replacing the Product.

108.    Plaintiff demands judgment against Defendant for compensatory damages plus attorney's fees, interest and costs.

## COUNT IV
## VIOLATION OF MAGNUSON-MOSS ACT

109.    Plaintiffs adopts and incorporates by reference all allegations contained in the foregoing paragraphs as though fully set forth herein.

110.    The Magnuson-Moss Consumer Products Liability Act, 15 U.S.C §2301, et seq. ("MMCPWA" or the "Act") provides a private right of action to purchasers of consumer products against retailers who, inter alia, fail to comply with the terms of a written warranty, express warranty and/or implied warranty.

111.    Plaintiff is a "consumers" as defined in 15 U.S.C. § 2301(3) as he is a person to whom such product is transferred during the duration of an implied or written warranty.

112.    Product is a "consumer product" as defined in 15 U.S.C. § 2301(1).

113.    Defendant is a "warrantor" as defined in 15 U.S.C. § 2301(5).

114.    Defendant provided Plaintiff with "written warranties" within the meaning of 15 U.S.C. § 2301(6).

115.    These written warranties include Defendant's warranty which provided with the product sold to Plaintiff, which states that Defendant warrants to the original purchaser of a new firearm that "your Remington firearm will be free from defect in material and workmanship." In the event a defect is found the purchaser must return the gun to the factory or an authorized warranty repair center at their own cost. Defendant then have the option to" repair the defect(s) or replace the firearm at no cost to you."

116.     Defendant has failed to remedy the defects of the Product despite knowledge of its dangerous condition and propensity to discharge with a trigger pull.

117.     Defendant has been given a reasonable opportunity by Plaintiff to cure such failures and to comply with the warranty yet has repeatedly failed to so.

118.     Plaintiff has suffered damages as a direct and proximate result of Defendant's breach of warranty.

119.     As demonstrated above, Defendant failed to comply with the terms of its warranties - written, express and implied - with regard to the Product that it manufactured, advertised, distributed, marketed and/or sold.

120.     By virtue of the foregoing, Plaintiff is entitled to an award of damages and other appropriate relief, including attorneys' fees.

## COUNT V
## BREACH OF EXPRESS WARRANTY

121.     Plaintiff adopts and incorporates by reference all allegations contained in the foregoing paragraphs as though fully set forth herein.

122.     Defendant expressly warranted that the Product is fully warranted against defects in workmanship and materials under normal use and service." Defendant agreed "to repair the defect(s), or replace the firearm AT NO COST TO YOU." (emphasis in original).

123.     The Product, however, contains defects as alleged herein, resulting in a misfire when the trigger is not pulled. This defect is due to fundamental design and manufacturing errors well within the Defendant's area of experience and is present when the Product leaves the Defendant's control.

124.    Accordingly, Defendant failed to remedy the defective trigger as set forth in its warranty.

125.    The limitations of damages and the limitations contained in the express warranty provisions are harsh, oppressive and one-sided. The limitations related to the amount of damages, the type of remedies available to Plaintiff are unconscionable when Defendant knew or should have known that there are defects in the design and manufacturing of the Product.

126.    Upon information and belief, Defendant knew that the triggers had a history of misfires, resulting in injury, death, and damage to other property, yet Defendant failed and omitted to inform its distributors, its customers, Plaintiff and plaintiff's grandfather who purchased its Product.

127.    In light of the foregoing, Defendant's warranty failed its essential purpose and/or is unconscionable; therefore, Defendant's warranty with Plaintiff was breached.

128.    Also, Defendant's failure to remedy the defective triggers and all associated damages constitutes a breach of express warranty.

129.    The foregoing breaches of express warranty at issue were substantial factors in causing damages to Plaintiff.

130.    As a result of the foregoing, Plaintiff has suffered damages that was directly and proximately caused by the defective design and construction of the Remington Product.

## COUNT VI
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

131.    Plaintiff adopts and incorporates by reference all allegations contained in the foregoing paragraphs as though fully set forth herein.

132. At all times mentioned herein, Defendant designed, manufactured and sold the Remington Model 700 bolt action rifle with the patented Walker Fire Control, and prior to the time said Product was purchased by Plaintiff's grandfather, Defendant impliedly warranted to Plaintiff and his grandfather, that the Product was of quality and fit for the use for which it was intended.

133. Plaintiff and Plaintiff's grandfather relied on the skill and judgment of the Defendant in using the aforesaid Product.

134. The Product was unfit for its intended use and it was not of merchantable quality, as warranted by Defendant, in that it had propensities to break down (i.e., fire without a trigger pull) and fail to perform and protect when put to its intended use. The aforesaid product caused Plaintiff to sustain damages and personal injury as herein alleged.

135. Defendant designed and manufactured the Product using a defective trigger assembly. Defendant designed, manufactured, sold and placed the Product into the stream of commerce knowing and expecting that the Product would be used by consumers and around members of the general public. Defendant knew, or should have known, that its Product had a propensity to fire without a trigger pull.

136. After Plaintiff was made aware of his damages as a result of the aforesaid Product, notice was duly given to Defendant of the breach of said warranty.

137. Defendant failed to provide adequate remedy and caused its implied warranties to fail of their essential purpose, thereby permitting remedy under implied warranties.

138. As a direct and proximate result of the breach of said warranties, Plaintiff has suffered and will continue to suffer loss as alleged herein in an amount to be determined at trial.

139.   Plaintiff demands judgment against Defendant for compensatory damages for himself.

COUNT VII
FRAUDULENT CONCEALMENT

140.   Plaintiff adopts and incorporates by reference all allegations contained in the foregoing paragraphs as though fully set forth herein.

141.   At all times mentioned herein, Defendant, through its experience, were in a position of superiority to Plaintiff and as such had the duty and obligation to disclose to Plaintiff the true facts and its knowledge concerning the Product; that is that said product was defective, had the propensity to fire without a trigger pull, and otherwise were not as warranted and represented by Defendant. Defendant made the affirmative representations as set forth in this Complaint to Plaintiff and the general public prior to (and after) the date plaintiff's grandfather purchased the Product, while at the same time concealing the material defects described herein. All of these facts were material to consumers' (such as Plaintiff's grandfather) purchase decisions.

142.   The material facts concealed or not disclosed by Defendant to Plaintiff are material facts in that a reasonable person would have considered those facts to be important in deciding whether or not to purchase Defendant's Product.

143.   At all times mentioned herein, Defendant intentionally, willfully, and maliciously concealed or suppressed the facts set forth above from Plaintiff and with the intent to defraud as herein alleged.

144.   At all times mentioned herein, Plaintiff reasonably relied on Defendant to disclose those material facts set forth above. If Defendant had disclosed the above facts to Plaintiff and

plaintiff's grandfather and had they been aware of said facts, they would have either negotiated a lower price to reflect the risk or simply avoided the risk all together by purchasing a different rifle.

145. Defendant continued to conceal the defective nature of its Product even after the public began to report problems. Indeed, Defendant continue to cover up and conceal the true nature of the problem.

146. As a result of the previous and continued concealment or suppression of the facts set forth above, Plaintiff sustained damages in an amount to be determined at trial.

## DAMAGES

147.    As a direct and proximate result of Defendant's actions Plaintiff sustained personal injuries and has incurred and will incur medical expenses as a direct and proximate result of his injuries. Accordingly, Plaintiff sues the defendant for the following:

    a)    Reasonable and necessary medical, hospital, doctor and physical therapy expenses (past, present and future);

    b)    Pain and suffering;

    c)    Mental anguish;

    d)    Loss of enjoyment of life;

    e)    Permanent medical impairment;

    f)    Lost income.

Plaintiff avers that these damages were incurred as a direct and proximate result of defendant's actions as stated in paragraphs #11-146 as described above.

**WHEREFORE**, plaintiff demands a judgment against the defendant in the total sum of $3,000,000.00 for compensatory damages.

Premises considered, Plaintiff pray:

a.    That Summons be issued and service perfected upon the defendant;

b.    That Plaintiff be awarded treble damages and all legal fees and costs of litigation pursuant to Tennessee Consumer Protection Act, T.C.A. § 47-18-101 et seq.

c.    That Plaintiff be awarded all legal fees and costs of litigation pursuant to Magnuson-Moss Consumer Products Liability Act, 15 U.S.C §2301, et seq.

d.    That a money judgment be entered against the defendant in the amount of $3,000,000.00, plus interests and costs; and

e.    That Plaintiff have all such other, further and general relief to which he may show himself to be entitled upon a trial of this cause.

f.    Enter an award of pre-judgment and post-judgment interest, as provided by law;

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all claims so triable.

Respectfully submitted,

SAMPLES, JENNINGS, CLEM & FIELDS, P.L.L.C.

By: _____

J. Christopher Clem
TN Bar No. 015793
    Attorneys for Plaintiff
130 Jordan Drive
Chattanooga, Tennessee 37421
Telephone: 423-892-2006
Facsimile: 423-892-1919

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHERN DIVISION

In re:

REMINGTON OUTDOOR COMPANY, INC., *et al.*,[10]

Debtors.

Chapter 11

Case No. 20-81688-CRJ11

Jointly Administered

### NOTICE OF ELECTION TO OBTAIN RELIEF FROM STAY

**PLEASE TAKE NOTICE** that, pursuant to this Court's *Findings of Fact, Conclusions of Law, and Order Modifying and Confirming the Joint Chapter 11 Plan of the Debtors, the Official Committee of Unsecured Creditors, and Exit Term Loan Lenders* [Docket No. __] (the "Confirmation Order"),[11] the holder of the Class 7 Tort Claim(s) identified below hereby makes his or her election to obtain relief from the automatic stay and any plan injunction with respect to the Class 7 Tort Claim(s) identified below solely as to the Stay Relief Scope effective on the Stay Relief Effective Date and subject to the terms of the Confirmation Order and the Plan. The undersigned holder shall service this notice on the Plan Administrator and his counsel.

| | |
|---|---|
| Holder Name(s): | Christopher A. Hughes |
| Proof of Claim Number(s): | Claim No. 24 |
| Proceeding to be Continued: (Parties, Court, Case No.) | Christopher A. Hughes v. Remington Arms Company, LLC |
| | Circuit Court of Bledsoe County, TN |
| Date Submitted: | April 28, 2021 |
| | Signed: /s/ Chris Clem |
| | Name: J. Christopher Clem |

Address for Notices: 130 Jordan Drive, Chattanooga, TN 37421

---

[10] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Remington Outdoor Company, Inc. (4491); FGI Holding Company, LLC (9899); FGI Operating Company, LLC (9774); Remington Arms Company, LLC (0935); Barnes Bullets, LLC (8510); TMRI, Inc. (3522); RA Brands, L.L.C. (1477); FGI Finance, Inc. (0109); Remington Arms Distribution Company, LLC (4655); Huntsville Holdings LLC (3525); 32E Productions, LLC (2381); Great Outdoors Holdco, LLC (7744); and Outdoor Services, LLC (2405). The Debtors' corporate headquarters are located at 100 Electronics Boulevard SW, Huntsville, AL 35824.

[11] Capitalized terms used herein without definition have the meanings given to them in the Confirmation Order.



## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the Notice of Election to Obtain Relief from Stay has been sent in the United States Mail or through electronic filing via CM/ECF to:

Gene Davis
Pirinate Consulting Group, LLC
5 Canoe Brook Drive
Livingston, NJ 07039
GeneDavis@PirinateConsulting.com

Dated April 29 , 2021

/s/ Chris Clem